# EXHIBIT C

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

CGH TECHNOLOGIES, INC.,

      Plaintiff,

    v.

GLYN OWEN,

      Defendant.

Case No: 2020 CA 002038 B

Judge Jason Park

Mediation: 12/15/2021 at 11:00 a.m.

## ORDER

This matter is before the Court on (1) the defendant's motion for summary judgment, filed May 24, 2021; (2) the plaintiff's motion for partial summary judgment, filed May 24, 2021; (3) the plaintiff's motion for a court order sealing exhibit in support of its motion for partial summary judgment, filed May 24, 2021; (4) the plaintiff's motion to sanction defendant for spoliation of evidence, filed May 24, 2021; and (5) the plaintiff's motion to strike defendant's untimely opposition to plaintiff's motion to sanction defendant for spoliation of evidence, filed June 9, 2021. Upon consideration of the motions, the respective opposition and reply memoranda, and the entire record, and for the reasons stated below, the Court denies the defendant's motion for summary judgment, grants the plaintiff's motion for partial summary judgment, grants the plaintiff's motion to seal as conceded, denies as moot the plaintiff's motions for sanctions and to strike, and enters summary judgment for the plaintiff on counts I, II, and III of the complaint and count I of the counterclaim.

## BACKGROUND

This action for breach of contract arises from defendant Glyn Owen's employment with and termination by plaintiff CGH Technologies, Inc. ("CGH"). The following facts are undisputed

unless otherwise noted. In March 1998, Mr. Owen was hired as a Contracts Administrator by CGH,
a Maryland corporation that provides information engineering solutions, software development,
and management support services to the United States government, foreign governments, and
private sector organizations. *See* Compl. ¶¶ 2-3, 7; Answer ¶¶ 2-3, 7; Countercl. ¶ 6. CGH
develops, implements, and licenses software products for its customers, including the Aeronautical
Surface Screening Evaluation Tool ("ASSET"), which allows customers to collect and analyze
aeronautical data for aviation decision-making purposes. *See* Compl. ¶ 9; Answer ¶ 9.

## I.   THE NON-COMPETE AND NON-DISCLOSURE AGREEMENTS

As a CGH employee, Mr. Owen executed Non-Compete and Non-Disclosure Agreements
(collectively, "the Agreements") with CGH. *See* Pl.'s Mot. for Summ. J., Ex. 3 (Decl. of Shelley
Lewis) ("Lewis Decl."), Ex. A (Non-Compete Agreement); *id.*, Ex. B (Non-Disclosure
Agreement). These agreements were executed on or about September 3, 2008 in the presence of
Shelley Lewis, then-human resources manager and current director of resource management for
CGH. *See* Lewis Decl. ¶¶ 1-5.

Article 2 of the Non-Compete Agreement provides that for the period of their employment
at CGH, and for one year after the employment ends, employees will not "either directly or through
others, solicit work from or perform services for, any customer of the Company which is or are in
any way similar to the work or services performed . . . while employed by the Company." Non-
Compete Agreement art. 2. This provision applies to "all customers with whom the Employee had
contact with during his/her employment with the Company or whose identity the Employee learned
as a result of his/her employment with the Company." *Id.* Under the Non-Compete Agreement,
"customer" is defined as "any person or entity to which the Company has provided goods or
services or proposed to provide goods or services" at any time during the employee's employment.

*Id.* Where the customer is a government agency, a "customer" is "deemed to be the bureau, section,

division, or other operating unit" of the agency. *Id.*

Article 3 of the Non-Compete Agreement provides that during their employment at CGH,

employees will not connect with any business competitors of CGH as employees, agents, partners,

or consultants. *Id.* art. 3. Article 3 further provides that:

> [F]or a period of 18 months after the later of (i) the date of the Employee's . . .
> voluntary or involuntary termination of employment with the Company, or (ii)
> the date a court of competent jurisdiction enters an order enforcing this
> provision, the Employee will not (except with the written consent of the
> Company), directly own, manage, operate, control, or participate in or be
> connected with as an officer, shareholder, employee, member, representative,
> broker, agent, salesperson, partner, distributor, consultant or otherwise any
> business which is competitive with the business of the Company and which
> operates in the District of Columbia or in any country outside of the District of
> Columbia where the Employee performed services on behalf of the Company.
> Nor shall the Employee engage in any other activity for the purpose of soliciting
> or selling to any current or potential customer of the Company any product or
> service which competes with the Company's products and/or services or divert
> or take away any customer of the Company or divert or take away any business
> of any customer of the Company.

*Id.*

Article 6 of the Non-Compete Agreement provides that in the event of a breach or

threatened breach of Articles 1, 2, or 3, "the Company shall be entitled, in addition to remedies

otherwise available to the Company at law or in equity, to injunctions, preliminary and final,

enjoining and restraining such breach or threatened or intended breach and Employee consents to

the issuance thereof forthwith by any court of competent jurisdiction." *Id.* art. 6. If the Company

prevails in litigation for the purpose of enforcing the Non-Compete Agreement, "the Company

will be entitled, in addition to any damages or other relief ordered by the court, to an award of its

reasonable attorney's fees and costs incurred in such litigation." *Id.*

Article 7 of the Non-Compete Agreement provides that "[t]o the extent Employee is in

breach of Articles 1 or 2, the termination of each such restriction shall be tolled for the period of

time that the Employee remains in breach of Articles 1 or 2 as determined by the Company." *Id.*
art. 7. For example, if the employee is terminated and then immediately accepts a position "within
the same bureau, section, division, or other operating unit of a governmental agency for which he
or she performed services as an Employee of the Company and stays in that position for six
months," the term of the restrictive covenant in Article 2 will be extended from one year to eighteen
months after termination. *Id.*

The Non-Disclosure Agreement provides, in pertinent part, that employees of CGH shall
devote their full business time, attention, and energies to the business of CGH, and shall not, for
the duration of the Non-Disclosure Agreement, engage in any other business activity, whether for
gain, profit, or other pecuniary advantage. *See* Non-Disclosure Agreement art. 2. Under Article 3
of the Non-Disclosure Agreement, employees must maintain the secrecy of all confidential
information and trade secrets of CGH. *Id.* art. 3. Specifically, Article 3 provides that:

> [The employee] agrees that he/she will hold in trust and confidence all
> confidential information and trade secrets of CGH during the period of [the
> employee's] employment with CGH ad for a period of two years after the
> termination of [the employee's] employment with CGH for any reason. [The
> employee] further agrees that he/she will not make any independent use of,
> publish, or disclose, or authorize anyone to publish or disclose, to any other
> person or organization any of CGH's trade secrets and confidential information,
> except as required I the course of his/her employment with CGH. Upon request
> of CGH, [the employee] shall promptly return all tangible expressions of trade
> secrets and confidential information in his/her possession and control and all
> copies thereof.

*Id.* Under Article 3, the terms "trade secrets" and "confidential information" include:

> [A]ll documents marked "CGH proprietary/confidential," software (source and
> object code), algorithms, computer processing systems, techniques,
> methodologies, formulae, processes, compilations of information, drawings,
> proposals, job notes, reports, records, and specifications, the identity of CGH's
> clients and prospective clients, customer contacts, contracts, contract proposals,
> licenses, pricing information pertaining to its software products and services,
> cost information, financial statements, delivers produced by the CGH for a
> client, training materials and procedure manuals.

4

*Id.* Article 3 also provides that employees "shall not remove any trade secret or confidential

information, including documents marked 'CGH proprietary/confidential,'" from CGH's premises

without the written consent of a CGH representative. *Id.*

> Article 5 of the Non-Disclosure Agreement provides that:

> > [The employee] . . . acknowledges that because of the nature of [the
> > employee's] work for CGH, [the employee's] solicitation of CGH's clients,
> > employees, contractors and consultants with whom [the employee] develops a
> > relationship during the term of his/her employment with CGH would
> > necessarily involve the unauthorized use or disclosure of confidential
> > information, trade secrets proprietary relationships and/or goodwill of CGH.
> > Therefore [the employee] agrees that upon termination of his/her employment
> > for any reason, [the employee] will not, for a period of one year from the date
> > of termination, interfere with CGH's relationship with any client using any
> > confidential information, proprietary relationships or trade secrets of CGH.

*Id.* art. 5.

Under Article 6 of the Non-Disclosure Agreement, the signatory employee agreed that in

the event of breach or threatened breach, "CGH's remedies at law would be inadequate and CGH

shall be entitled to entry of an injunction (without any bond or security being required), either

temporary or permanent, against him/her in any suit in equity . . . or in any other action at law."

*Id.* art. 6. Should CGH prevail in any suit brought under the Non-Disclosure Agreement, the

agreement provides that "CGH shall be entitled to recover the cost of such suit, including its

reasonable attorney's fees." *Id.*

## II.    MR. OWEN'S EMPLOYMENT WITH CGH

Mr. Owen performed services on behalf of CGH from his office in Washington, D.C. and

from his home in Prince William County, Virginia.[1] *See* Pl.'s Mot. for Summ. J., Ex. 1 (Dep. Tr.

---

[1]    Though the plaintiff asserts that Mr. Owen performed work on behalf of CGH from Moore
County, North Carolina, *see* Pl.'s Statement of Material Facts ¶ 7, the Court could not locate any
record evidence supporting this contention.

of Glyn Owen) ("Owen Tr.") 81:4-8. In 2001, Mr. Owen began running CGH's accounting and finance department. *See id.* 178:2-4. In this position, Mr. Owen was responsible for financial and budget planning and for setting CGH's indirect rates and pricing for the Company's government contracts. *See id.* 92:3-93:14. CGH asserts that Mr. Owen was also responsible for "maintaining and developing . . . accounting practices," and that Mr. Owen performed the role of a CFO, but Mr. Owen disputes these allegations, asserting that he was not a CFO and that Lloyd Celistan, another CGH employee, had primary responsibility for developing accounting practices. *Id.* 92:10-93:9. However, Scott Perando, CGH's senior accountant who reported directly to Mr. Owen, asserts that Mr. Owen performed the function of a CFO. *See* Pl.'s Mot. for Summ. J., Ex. 12 (Decl. of Scott Perando) ("Perando Decl.").

By 2004, Mr. Owen became the Chief Operating Officer ("COO") of CGH, reporting only to Cindy Troutman, the President and sole shareholder of CGH.[2] *See* Compl. ¶ 3; Owen Tr. 92:2-9. As COO, Mr. Owen was responsible for "corporate capture," "operations finance," "business development," "contract agreement review," and "technical writing and contract compliance." Pl.'s Mot. for Summ. J., Ex. 2 (Glyn Owen Curriculum Vitae) ("Owen CV"). Moreover, neither party disputes that, as alleged in the Complaint, Mr. Owen had primary responsibility for marketing the ASSET software to various European entities, including the Irish Aviation Authority ("IAA") and the Federal Office of Civil Aviation in Switzerland ("FOCA"), and that Mr. Owen secured a contract for CGH with the IAA for the implementation and deployment of ASSET. *See* Compl. ¶ 9; Answer ¶ 9.

---

[2] While employed at CGH, between 1999 and 2011, Mr. Owen was in a romantic relationship with Ms. Troutman. *See* Owen Tr. 69: 3-13. In 2012 or 2013, Mr. Owen began dating his now wife. *Id.*

CGH regularly loans money to Ms. Troutman to cover expenses at her horse and alpaca hobby farm in Prince George's County, Maryland, and CGH pays for Ms. Troutman's corporate credit card account, which is used to pay farm expenses. *See* Pl.'s Mot. for Summ. J., Ex. 13 (Notes to 2018 CGH Financial Statements) at 10; Perando Decl. ¶ 5; Pl.'s Mot. for Summ. J., Ex. 11 (Decl. of Cindy Troutman) ("Troutman Decl.") ¶ 25. These loans and directly paid expenses are reported on CGH's income statement as an account receivable. *See* Notes to 2018 CGH Financial Statement at 10; *see also* Owen Tr. 182:14-183:4. Mr. Perando asserts that CGH has clarified to lenders that loans to the farm are not to be considered as an asset for determining CGH's borrowing base, *see* Perando Decl. ¶ 5, and to date, Ms. Troutman has repaid at least $500,000 to CGH, *see* Pl.'s Mot. for Summ. J., Ex. 14 (Wire Transfer). Mr. Owen asserts that, in including loans to the farm as an account receivable on CGH's income statement, Ms. Troutman attempted to mislead lenders, as "[s]he had no intention of paying anything back to the accounts." Owen Tr. 183:5-187:20. On or about December 10, 2019, Mr. Owen sent an email to Ms. Troutman suggesting that she "forgive" a portion of the farm receivable on CGH's income statement. *See* Pl.'s Mot. for Summ. J., Ex. 15 (Glyn Owen Email to Cindy Troutman, Dec. 10, 2019) ("Owen/Troutman Email") ("[I]n 2017 the net income was 305K of which the farm AR, which will never be paid back, could have been reduced as a partial forgiven farm debt of the 305k. In other words show 100k net and forgive AR Farm of 205K.").

Beginning in 2011, CGH entered into a series of three contracts ("CMC Contracts") with the prime contractor of the Federal Aviation Administration ("FAA"), pursuant to which CGH was to supply technicians to various FAA facilities around the country. *See* Compl. ¶ 29; Answer ¶ 29. Mr. Owen was the contracts administrator for the CMC Contracts. *See* Pl.'s Mot. for Summ. J., Ex. 4 (Dep. Tr. of Glyn Owen, *Pennington v. CGH Technologies, Inc.*, Nov. 4, 2020) ("Penn/Owen

Tr.") 56:3-24. In this role, Mr. Owen, along with Jerry Juratsis, another CGH employee, handled

pricing proposals. *See* Owen Tr. 109:14-16.

John Carlson and Felix Enriquez worked as the CGH program managers for the CMC

Contracts. *See* Pl.'s Mot. for Summ. J., Ex. 5 (Dep. Tr. of John Carlson, *Pennington v. CGH*

*Technologies, Inc.*, Oct. 23, 2020) ("Carlson Tr.") 6:24-7:4, 8:20-9:6; *id.* Ex. 6 (Decl. of Felix

Enriquez) ("Enriquez Decl.") ¶ 2. According to Mr. Enriquez, around 2015, Mr. Owen informed

both Mr. Enriquez and Mr. Carlson that they could offer to hire new technicians on the CMC

Contracts as either 1099 independent contractors or W-2 employees. *See* Enriquez Decl. ¶ 5. Mr.

Carlson and Mr. Enriquez both assert that Mr. Owen directed them that these technicians were to

be treated as part-time workers, ineligible for overtime pay, paid time off, and holiday pay. *See*

Carlson Tr. 48:3-49:5 ("Q Do you know why [the technicians] were not paid more than – more as

far as an hourly rate of time and a half after 40 hours? A Only that that's what Glyn told me, is we

don't pay overtime to part-time employees. That was the reason given to me."); Enriquez Decl. ¶

6; Pl.'s Mot. for Summ. J., Ex. 7 (Dep. Tr. of Robert Beach, *Pennington v. CGH Technologies,*

*Inc.*, Aug. 18, 2020) 118:7-12. Mr. Owen does not directly dispute that he allowed the technicians

to be classified as W-2 employees rather than independent contractors, but asserts, without citation

to any record evidence, that "Mr. Owen was not responsible for the FLSA for CGH." Def.'s Opp'n

to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") at 4.

On October 10, 2019, the FAA directed that CGH technician Matthew Pennington be

removed from the CGH Contract, and CGH terminated Mr. Pennington that same day. *See* Pl.'s

Mot. for Summ. J., Ex. 8 (Email Chain, Oct. 10, 2019); *id.* Ex. 9 (Pennington Termination Letter).

On October 25, 2019, Mr. Pennington filed a collective action complaint against CGH under the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), alleging that CGH had failed to

compensate him and similarly situated workers for overtime work. *See* Pl.'s Mot. for Summ. J., Ex. 10 (*Pennington v. CGH Technologies, Inc.*, No. 6:19-cv-02056, Compl. ¶ 3 (M.D. Fla. Oct. 25, 2019)) ("Pennington Compl."). Ms. Troutman, CGH's President, asserts that she did not become aware that CGH's technicians were not being paid overtime until the Pennington lawsuit was filed. *See* Troutman Decl. ¶ 11.

As of November 2019, Mr. Owen was aware that ITV Consult AG ("ITV") was considering teaming with CGH for a bid on a FOCA data collection services contract. *See* Owen Tr. 279:16-19 ("Q. You were intending and hoping that ITV would team with CGH on the FOCA bid as of November 14, 2019, correct? A. They were a strong candidate, yes."); *see also id.* 14:18-22; Pl.'s Mot. for Summ. J., Ex. 22 (Glyn Owen Email to Roland Baumann, Nov. 14, 2019) ("Owen/Baumann Email"). At this time, Mr. Owen informed Roland Baumann and Ruedi Schneeberger of ITV that many requirements of the ASSET software failed to meet the data catalogue requirements and that CGH had failed to implement ASSET for the IAA. *See* Owen Tr. 316:11-21. In an email dated November 21, 2019, Mr. Owen expressed to Douglas Campbell of Syneca Research Group, LLC ("Syneca"), "[I] want foca – period – [I] want it taken away so [I] can prove with better oversight and technical people without vinod it can work . . . believe me – [I] want this very bad." *See* Pl.'s Mot. for Summ. J., Ex. 24 (Glyn Owen Email to Douglas Campbell, Nov. 21, 2019) ("Owen/Campbell Email 1").

During the fourth quarter of 2019, Mr. Owen also communicated to Phillip Hughes of the IAA that the ASSET software was deficient and could not be properly implemented without him.[3] *See id.* 323:20-324:19; *see also* Pl.'s Mot. for Summ. J., Ex. 23 (Glyn Owen Email to Douglas

---

[3]     CGH lost its contract with the IAA in July 2020. *See* Troutman Decl., Ex. A (Termination Letter); Owen Tr. 322:17-323:3.

Campbell, Dec. 21, 2019) ("Owen/Campbell Email 2") ("[I] have sending [Mr. Hughes] all the issues with ASSET, he said he would lke [sic] to have anything [I] have.").

## III.    MR. OWEN'S TERMINATION FROM CGH

On December 20, 2019, Mr. Owen's employment with CGH was terminated for cause. *See* Pl.'s Mot. for Summ. J., Ex. 17 (Decl. of Robert Beach) ("Beach Decl.") ¶ 6, 9-13; *id.*, Ex. 18 (Robert Beach Email to Glyn Owen, Dec. 20, 2019) ("Beach/Owen Email") ("While our investigation of your actions continues, this decision was driven by your continued refusal to act in the best interests of CGH and your continued insubordination."). In a handwritten note on the termination email, Mr. Owen stated, "Will not accept. Filing discrimination lawsuit for sexual harassment, age discrimination, and hostile work environment."[4] Beach/Owen Email. Mr. Owen has repeatedly stated that his termination was, in actuality, triggered by his breakup with Ms. Troutman and his new relationship with his now wife. *See* Owen/Penn Tr. 35:9-20; Owen Tr. 107:14-108:1; Pl.'s Mot. for Summ. J., Ex. 20 (Glyn Owen Email to Alan Kabat, Aug. 7, 2020).

On December 21, 2019, Mr. Owen sent an email to Mr. Campbell, informing him that the IAA had given CGA 60 days to finish or cancel their contract, and that he had suggested that Mr. Hughes hire both Mr. Campbell and Mr. Owen as outside auditors. *See* Owen/Campbell Email 2. In January 2020, Mr. Owen informed Mr. Baumann of ITV, which was considering teaming with CGH on the FOCA contract, that CGH was financially unstable, and throughout early 2020,

---

[4]    After his termination, Mr. Owen filed a charge of discrimination with the District of Columbia Office of Human Rights ("OHR"), alleging that he had been terminated for breaking off his relationship with Ms. Troutman and had "been retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act." *See* Pl.'s Mot. for Summ. J., Ex. 36 (OHR Charge of Discrimination). Neither party provided any information on the status of this charge of discrimination.

exchanged a few emails and text messages with Mr. Baumann about the FOCA bid.[5] *See* Owen
Tr. 369:17-371:17.

Beginning in February 2020, Mr. Owen began working with Mr. Campbell to submit a bid
for the FOCA tender on behalf of Syneca. *See* Owen Tr. 174:19-175:11; Pl.'s Mot. for Summ. J.,
Ex. 27 (Dep. Tr. of Douglas Campbell) ("Campbell Tr.") 41:2-6. While working on the bid, Mr.
Owen had primary responsibility for communicating with FOCA. *See* Campbell Tr. 136:3-5. On
or about February 29, 2020, Mr. Owen created an account on the non-production servers of CGH
and used that account to log into the ASSET application in order to obtain documents for data
collection services and the AIXM data catalogs. *See* Owen Tr. 168:21-170:15. When Owen's
access to the ASSET application was discovered, Jason Moore, the Help Desk Support
Specialist/Project Coordinator for CGH, disabled Mr. Owen's "unauthorized" account. See Pl.'s
Mot. for Summ. J., Ex. 29 (Decl. of Jason Moore) ("Moore Decl.") ¶ 4. According to Mr. Moore,
Mr. Owen's original ASSET accounts had been disabled upon his termination, *see id.*, but Mr.
Owen asserted in deposition testimony that the ASSET application is public domain and that
"[a]nybody can sign on and get an account for it." Owen Tr. 170:18-22.

The Syneca bid for the FOCA contract incorrectly identified Mr. Owen as Syneca's Chief
Operating Officer, *see id.* 193:22-194:2, and though CGH had not licensed ASSET to Syneca, in
their bid for the FOCA contract, Mr. Owen and Mr. Campbell wrote that Syneca had the necessary
intellectual property rights to ASSET to bid the contract, *see id.* at 42:6-14, 43:7-12. The Syneca

---

[5]    These emails and text messages no longer exist. Despite his former counsel's warning to
preserve all relevant emails, text messages, and documents beginning in late January or early
February 2020, *see* Owen Tr. 63:3-15, and CGH's litigation hold letter dated April 24, 2020, *see*
Pl.'s Mot. for Summ. J. Ex. 28 (Alan Kabat Email to Glyn Owen, Apr. 24, 2020) ("Kabat/Owen
Email"), Mr. Owen has admittedly routinely deleted emails and text messages that were potentially
responsive to CGH's discovery requests, *see* Pl.'s Mot. for Summ. J., Ex. 27 (Dep. Tr. Of Douglas
Campbell) ("Campbell Tr.") 20:11-22, 21:13-22.2.

bid asserted CGH's inability to implement the ASSET software and highlighted CGH's alleged financial difficulty. *See* Pl.'s Mot. for Summ. J., Ex. 30 (Syneca Reply to FOCA Tender) ("Syneca Reply") at i-iv. Specifically, the bid stated that:

> Unfortunately, the unpredictability of capital requirements in other areas of CGH involvement has created a lot of uncertainty for that company. Faced with a demoralized staff and disenfranchised working force, many CGH employees have found employment elsewhere, including Dr. Campbell and Glyn Owen.

*Id.* at 63. Moreover, in Syneca's bid, Mr. Owen and Mr. Campbell lifted language directly from a CGH and IAA team proposal submitted to the Swedish Air Navigation Service ("LFV") for data collection services using ASSET. *See id.* 34:7-37:17.

In April and May 2020, Mr. Owen worked with Mr. Campbell to bid on an FAA contract for Professional Support Services on behalf of Perspecta, Inc. ("Perspecta"), a CGH competitor. *See* Campbell Tr. 12:2-19. CGH bid on the same contract. *See* Troutman Decl. ¶ 30. Mr. Campbell paid Mr. Owen $15,000 for his work on this bid. *See* Campbell Tr. 12:2-12. Around the same time, Mr. Owen entered into a consulting agreement with Concepts Beyond, another CGH competitor, for which he was paid $5,460. *See* Pl.'s Mot. for Summ. J., Ex. 32 (Owen's Responses to Pl.'s Interrogs.) ("Owen Interrogs.") ¶ 10.

At unspecified times, Mr. Owen sent several CGH confidential documents to his personal email account from his CGH email account, including internal pricing data for the CMC Contracts. *See* Pl.'s Mot. for Summ. J., Ex. 33 (CGH Confidential Documents); Owen Tr. 160:10-19. Forensic examination of Mr. Owen's personal computer showed that he accessed the internal pricing data (Excel file "Staffing_GOV2_GO.xlsx") on or about October 3, 2020. *See* Pl.'s Mot. for Summ. J., Ex. 34 (Owen MacBook Pro File Listing). Six days later, on October 9, 2020, Mr. Owen's name appeared on a PowerPoint presentation put together by Crown Consulting, Inc. ("Crown"), a CGH competitor, about CGH contracts it planned to pursue, including the CMC

12

Contracts. *See* Pl.'s Mot. for Summ. J., Ex. 35 (Crown PowerPoint); *id.* Ex. 37 (Decl. of Douglas

Campbell) ("Campbell Decl."). In October 2020, in an attempt to obtain a consulting contract with

Crown, Mr. Owen and Mr. Campbell prepared a document entitled "Strategy to go after CGH

expiring contracts," and sent the document to Al Kahn, Crown's CEO. *See* Pl.'s Mot. for Summ.

J., Ex. 38 (Strategy to Go After CGH Expiring Contracts); *see also id.* Ex. 39 (Emails Between

Glyn Owen and Douglas Campbell, Sept. 30, 2020 – Oct 5, 2020) ("Owen/Campbell Email 3");

Campbell Decl.

## IV. THE SUPERIOR COURT LITIGATION

On March 26, 2020, CGH commenced this litigation against Mr. Owen, asserting claims

for breach of contract, breach of fiduciary duty, fraud, trade libel, and conversion. *See* Compl. ¶¶

43-96. On June 5, 2020, Mr. Owen filed a counterclaim, asserting claims for retaliation in violation

of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1), and for conversion. *See* Countercl. ¶¶

35-51. On July 8, 2020, the Court dismissed the plaintiff's trade libel claim (count V of the

complaint). *See* Order (July 8, 2020). On May 24, 2021, the plaintiff and defendant filed cross

motions for summary judgment. *See generally* Pl.'s Mot. for Summ. J.; Def.'s Mot. for Summ. J.

The plaintiff filed an opposition to the defendant's motion on June 7, 2021, and the defendant filed

an opposition to the plaintiff's motion on June 8, 2021. *See generally* Pl.'s Opp'n to Def.'s Mot.

for Summ. J. ("Pl.'s Opp'n"); Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n"). The

plaintiff also filed a motion to sanction the defendant for spoliation of evidence and a motion to

seal exhibit on May 24, 2021, *see generally* Pl.'s Mot. for Sanctions; Pl.'s Mot. to Seal, and the

defendant filed an opposition to the plaintiff's motion for sanctions on June 11, 2021, *see generally*

Def.'s Opp'n to Pl.'s Mot. for Sanctions. The plaintiff filed a motion to strike the defendant's

untimely opposition to the motion for sanctions on June 9, 2021, and the defendant filed an

opposition to this motion on June 9, 2021. *See generally* Pl.'s Mot. to Strike; Def.'s Opp'n to Pl.'s Mot. to Strike.

**LEGAL STANDARD**

A party moving for summary judgment must demonstrate that there are no material facts in dispute and that the party is entitled to judgment as a matter of law. *See* D.C. Super. Ct. Civ. R. 56(a). Once the moving party meets its burden, the non-moving party must present specific facts demonstrating that there is a material factual dispute. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A genuine issue of material fact exists if the record contains "some significant probative evidence . . . so that a reasonable fact-finder would return a verdict for the non-moving party." *Brown v. 1301 K St. Ltd. P'ship*, 31 A.3d 902, 908 (D.C. 2011) (quoting *1836 S Street Tenants Ass'n v. Estate of Battle*, 965 A.2d 832, 836 (D.C. 2009)). A motion for summary judgment must be granted if, taking all inferences in the light most favorable to the nonmoving party, a reasonable juror could not properly find for the nonmoving party under the appropriate burden of proof. *See, e.g., Woodfield v. Providence Hosp.*, 779 A.2d 933, 936-37 (D.C. 2001).

## I.   THE COURT DENIES THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In his motion for summary judgment, the defendant asserts that he is "entitled to summary judgment to dismiss" the claims in the plaintiff's complaint, and also argues that he is entitled to summary judgment on his counterclaims.[6] *See* Def.'s Mot. for Summ. J. at 1-13, 15. Specifically,

---

[6]   Much of the defendant's motion for summary judgment appears to have been copied directly from his June 5, 2020 motion to dismiss, which was written by his former counsel. *See generally* Def.'s Mot. to Dismiss. To the extent that Mr. Owen asks the Court to dismiss the claims in the plaintiff's complaint, the Court concluded in its order of July 8, 2020 that the surviving claims in the complaint were properly pled under D.C. Super. Ct. Civ. R. 12(b)(6). *See generally* Order (July 8, 2020).

the defendant argues that the Court must dismiss the plaintiff's breach of contract claims because

the plaintiff "failed to plead damages with particularity," and asserts that the plaintiff's claim for

breach of fiduciary duty must be dismissed because the plaintiff has failed to sufficiently allege

damages and because the plaintiff is judicially estopped from asserting that Mr. Owen improperly

classified the technicians involved in the Pennington litigation as employees rather than as

independent contractors. *See id.* at 1-11. The defendant also argues that the Court must dismiss the

plaintiff's claims for fraud and conversion because the plaintiff has failed to produce discovery in

support of these claims, and asserts that he is entitled to summary judgment on his counterclaims

because CGH lacks standing.   *See id.* at 11-15. In opposition, the plaintiff argues that the

defendant's motion must be denied for noncompliance with D.C. Super. Ct. Civ. R. 56, and argues

in the alternative that the Court should deny the defendant's motion for the reasons stated in the

plaintiff's own motion for summary judgment. *See generally* Pl.'s Opp'n.

Under D.C. Super. Ct. Civ. R. 56(b)(2)(A), when moving for summary judgment, "the

movant must file a statement of the material facts that the movant contends are not genuinely

disputed. Each material fact must be stated in a separate numbered paragraph." *Id.* Courts in the

District of Columbia have "long upheld strict compliance with the district's court's local rules on

summary judgment." *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002); *see also Gardels v.

Central Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980) ("[T]he procedure contemplated

by the [local] rule ... isolates the facts that the parties assert are material, distinguishes disputed

from undisputed facts, and identifies the pertinent parts of the record."). While District of

Columbia courts caution that "in view of the severity of dismissal of a potentially meritorious

claim, . . . treating an issue as conceded for failure to respond fully to a motion for summary

judgment 'should only be applied to egregious conduct,'" *Burke*, 286 F.3d at 518 (quoting *Robbins*

15

*v. Reagan*, 780 F.3d 37, 52 n.23 (D.C. Cir. 1985)), "failure to file a proper [statement of material facts] 'may be fatal to the delinquent party's position,'" *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (quoting *Gardels*, 637 F.2d at 773)).

The Court denies the defendant's motion. As an initial matter, the defendant's motion fails to comply with Rule 56(b)(2)(A), as it contains sparse citations to record evidence and does not include a statement of undisputed material facts.[7] *See generally* Def.'s Mot. for Summ. J. Though nineteen exhibits are appended to the motion, many of the exhibits are unexplained in the motion and several are partially or wholly illegible. *See generally id.*, Exs. 1-19; *see, e.g., Jackson*, 101 F.3d at 151 (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) ("[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact."). In any event, even after sifting through the defendant's unorganized, single-spaced filings and the nineteen exhibits appended to the defendant's motion, the Court observes that none of these filings or exhibits, individually or collectively, appear to establish the defendant's entitlement to summary judgment on any of the claims in the complaint or the counterclaim.[8] *See* D.C. Super. Ct. Civ. R. 56(a) (stating that on a motion for summary

---

[7]    In his opposition to the plaintiff's motion for summary judgment, the defendant did not attempt to correct his failure to append a statement of material facts to his own motion, but instead asserted that the "facts in the motion were outlined concisely in chronological order." Def.'s Opp'n at 2-3. The Court cannot agree, noting that multiple full pages of the defendant's motion contain no citations to the record. *See generally* Def.'s Mot. for Summ. J.

[8]    The defendant's nineteen-page, single-spaced motion contravenes the undersigned's Supplement to the General Order, which provides that "[n]o party may submit a motion with a legal memorandum exceeding twenty (20) pages in length without obtaining leave of Judge Park," and refers to 20 double-spaced pages. *See* Judge Jason Park Supplement to General Order, available at https://www.dccourts.gov/sites/default/files/matters-docs/General%20Order%20pdf/Judge-Park-Supplement-to-General-Order.pdf.

judgment, it is the movant's burden to establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Accordingly, the Court denies the defendant's motion for summary judgment.

## II.   THE COURT GRANTS THE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In its motion for summary judgment, the plaintiff argues that it is entitled to summary judgment on its breach of contract claims because there is no genuine dispute of material fact that the defendant breached the Non-Compete and Non-Disclosure Agreements, and asserts that it is entitled to injunctive relief as well as monetary damages and attorney's fees on these breaches. *See* Pl.'s Mot. for Summ. J. at 6-15. The plaintiff also argues that it is entitled to summary judgment on its claim for breach of fiduciary duty because there is no material factual dispute that the defendant retained and disclosed the plaintiff's confidential information. *See id.* at 15-18. Finally, the plaintiff asserts that judgment must be entered on the defendant's counterclaim for retaliation in violation of the FCA because the defendant cannot establish a *prima facie* case by presenting evidence that he engaged in protected activity or that the plaintiff retaliated against him because of that activity. *See id.* at 18-20.

In opposition, the defendant asserts, without citation to any record evidence, that the plaintiff is not entitled to summary judgment on its claims for breach of contract and breach of fiduciary duty because the plaintiff "belies the Court with fictional disputes throughout their claim" and "the [plaintiff's] lack of discovery illustrates that their case is not plausible but hear[say]." Def.'s Opp'n at 3. The defendant does not respond to the plaintiff's motion for summary judgment as to his counterclaim for violation of the FCA, beyond asserting, without explanation, that the

17

plaintiff's "evidence is weak to non-existent" and arguing that "the Court should grant leeway to the Defendant for his efforts in putting forth the truth and defending himself."[9] *Id.* at 16.

## A.   The Court Enters Summary Judgment for the Plaintiff on its Breach of Contract Claims (Counts I and II of the Complaint)

To prevail on a breach of contract claim, a plaintiff must establish (1) a valid contract between the parties; (2) an obligation or duty arising from the contract; (3) a breach of that obligation or duty; and (4) damages caused by the breach. *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 131 (D.D.C. 2018) (citing *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015)).

The plaintiff seeks summary judgment its claims for breach of the Non-Compete Agreement (count I of the complaint) and the Non-Disclosure Agreement (count II of the complaint). Mr. Owen executed these agreements on September 3, 2008. *See* Non-Compete Agreement; Non-Disclosure Agreement.

Under Article 2 of the Non-Compete Agreement, for the period of his employment at CGH, and for one year after the employment ends, Mr. Owen agreed that he would not "either directly or through others, solicit work from or perform services for, any customer of the Company which is or are in any way similar to the work or services performed . . . while employed by the Company." Non-Compete Agreement art. 2. This provision applies to all customers with whom Mr. Owen had contact during his employment with CGH or whose identity he learned as a result of his employment. *Id.*

---

[9]     The defendant's opposition is titled "Opposed Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant/Counter-Plaintiff's Motion for Summary Judgment." *See* Def.'s Opp'n at 1. Rather than directly responding to the plaintiff's motion for summary judgment, the defendant quotes full paragraphs from the plaintiff's opposition to the defendant's own motion for summary judgment, then responds to these paragraphs. *See generally id.* The bulk of the defendant's arguments address the plaintiff's claims for fraud and conversion (counts IV and V of the complaint) and the defendant's counterclaim for conversion (count II of the counterclaim), and the opposition is devoid of citations to any record evidence. *See generally id.*

Pursuant to Article 3, Mr. Owen agreed that during his employment at CGH, he would not

connect with any business competitors of CGH as an employee, agent, partner, or consultant. *Id.*

art. 3. Article 3 further provides, in pertinent part, that:

> [F]or a period of 18 months after the later of (i) the date of [Mr. Owen's
> termination] or (ii) the date a court of competent jurisdiction enters an order
> enforcing this provision, [Mr. Owen] will not . . . directly . . . participate in or
> be connected with as an . . . agent, . . . consultant or otherwise any business
> which is competitive with the business of [CGH] and which operates in the
> District of Columbia or in any country outside of the District of Columbia where
> [Mr. Owen] performed services on behalf of [CGH]. Nor shall [Mr. Owen]
> engage in any other activity for the purpose of soliciting or selling to any current
> or potential customer of [CGH] any product or service which competes with
> [CGH's] products and/or services or divert or take away any customer of [CGH]
> or divert or take away any business of any customer of [CGH].

*Id.*

In the event of a breach of Articles 1, 2, or 3 of the Non-Compete Agreement, CGH is

entitled to "remedies . . . at law or in equity" as well as "injunctions . . . enjoining or restraining

such breach," and may recover its attorney's fees and costs incurred in litigation. *Id.* art. 6. If an

employee breaches Articles 1 or 2, the term of the restrictive covenant shall be tolled for the period

of time the employee remains in breach of those Articles. *Id.* art. 7.

Under the Non-Disclosure Agreement, Mr. Owen agreed that during his employment with

CGH, he would not engage in any other business activity, whether for gain, profit, or other

pecuniary advantage, and, during his employment and for two years thereafter, would not make

independent use of, publish, or disclose any of CGH's trade secrets and confidential information.

*See* Non-Disclosure Agreement art. 2, 3. Mr. Owen also agreed that, for a period of one year after

his termination, he would not "interfere with CGH's relationship with any client using any

confidential information, proprietary relationships or trade secrets of CGH." *Id.* art. 5. The Non-

19

Disclosure Agreement provides that in the event of breach or threatened breach, CGH shall be entitled to the entry of an injunction and may recover its costs and attorney's fees. *Id.* art. 6.

**1.      The Non-Compete and Non-Disclosure Agreements Are Valid and Enforceable**

"In order to be valid, covenants not to compete must protect some legitimate interest of the employer and must be reasonable in their scope." *Mercer Mgmt. Consulting v. Wilde*, 920 F. Supp. 219, 237 (D.D.C. 1996) (citing *Ellis v. Hurson Assoc., Inc.*, 565 A.2d 615, 618 (D.C. 1989)). Restrictions in such covenants are unreasonable where "the restraint is greater than is needed to protect the promisee's legitimate interest, or . . . the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." *Ellis*, 565 A.2d at 618 (noting that "a restraint is easier to justify . . . if the restraint is limited to the taking of his former employee's customers as contrasted with competition in general").

The Court finds that the plaintiff has demonstrated that the Non-Compete and Non-Disclosure Agreements are valid. The plaintiff asserts that the purpose of the Agreements is to further its "interests to protect its confidential information, as well as its reputation, relationships, and goodwill with actual and prospective customers of CGH." *See* Pl.'s Mot. for Summ. J. at 10. The Court finds that this purpose constitutes a "legitimate interest" under District of Columbia law. *See, e.g.*, *Wilde*, 920 F. Supp. at 237 (finding that restrictive covenant had legitimate purpose where plaintiff required employees to sign covenant "to protect the investment it made in its employees, preserve the confidentiality of information gleaned in the course of employment . . . , and protect itself from its employees leaving and capitalizing on [the plaintiff's] client base"). The Court also finds that the duration of the restrictive covenants in the Agreements, which range between one and two years after Mr. Owen's termination, *see generally* Non-Compete Agreement; Non-Disclosure Agreement, is reasonable, as District of Columbia courts have upheld both similar

and longer time periods, *see, e.g.*, *Wilde*, 920 F. Supp. at 237 (upholding one-year restrictive covenant); *Ellis*, 565 A.2d at 621 (upholding three-year restrictive covenant and noting that "agreements limiting competition for a period well in excess of three years have been sustained in this jurisdiction").

Finally, the Court finds that Article 3 of the Non-Compete Agreement, which prohibits signatories from engaging in any business competitive with the business of CGH within the District of Columbia and any other counties where the signatory performed work for CGH, *see* Non-Compete Agreement art. 3, is reasonable in scope, and that the other provisions in the Agreements, which restrict the solicitation of CGH customers contacted during the signatory's employment and the dissemination of CGH confidential information, are also reasonable.[10] *See generally* Non-Compete Agreement; Non-Disclosure Agreement; *see also, e.g.*, *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 430 (D.D.C. 2018) (upholding non-compete clause barring former employee from working for any competitor within 50 miles of the former employer's District of Columbia and Boston offices); *Ellis*, 565 A.2d at 620 (finding that a restrictive covenant's lack of a geographic limitation is not problematic where the former employee is not prevented from doing business but is prevented only from doing business with the former employer's clients, and noting that "prohibitions against the solicitation of customers known to the employee by virtue of his former employment are enforceable as reasonable restrictions protecting legitimate business interests of the employer"). On this record, the Court concludes that there is no material factual dispute that the Agreements are valid and enforceable.

---

[10]   Mr. Owen performed work on behalf of CGH in Washington, D.C. and Prince William County, Virginia. *See* Owen Tr. 81:4-8.

**2.     There Is No Genuine Dispute of Material Fact That Mr. Owen Breached Articles 2
and 3 of the Non-Compete Agreement**

The Court finds that there is no material factual dispute that Mr. Owen breached Article 2

of the Non-Compete Agreement. Neither party disputes that while employed at CGH, Mr. Owen

had primary responsibility for marketing ASSET to various entities, including the IAA and FOCA.

*See* Compl. ¶ 9; Answer ¶ 9. The record indicates that Mr. Owen solicited work from CGH

customer IAA while employed at CGH, by informing the IAA that ASSET was deficient and could

not be implemented without him, *see* Owen Tr. 321:20-324:19, and after his termination, by

promoting his services as an outside auditor on a contract between the IAA and CGH, *see*

Owen/Campbell Email 2.[11] As of November 2019, Mr. Owen was aware that CGH planned to

team with ITV to bid on a FOCA data collection services contract, *see* Owen Tr. 279:16-19, and

from December 2019 until April 2020, Mr. Owen worked with former CGH consultants Mr.

Campbell and Syneca to prepare a bid for the same contract, *see id.* 174:19-175:11; Campbell Tr.

41:2-6. Indeed, before his termination, Mr. Owen expressed a desire to "take[] [the FOCA

contract] away from CGH . . . [to] prove with better oversight and technical people without vinod

it can work." Owen/Campbell Email 1. And in April and May 2020, Mr. Owen, as a consultant to

Syneca, assisted CGH competitor Perspecta on a proposal to the FAA for security work, *see*

Campbell Tr. 12:2-19, a contract CGH also bid on, *see* Troutman Decl. ¶ 30. On this record, the

Court finds that there is no material factual dispute that Mr. Owen breached Article 2 of the Non-

Compete Agreement by "soliciting work from or performing services for" CGH customers, and

that this work was "similar to the work or services [he] performed" while employed at CGH. Non-

Compete Agreement art. 2; *see Legal Tech. Grp., Inc. v. Rajiv Mukerji*, 2019 U.S. Dist. LEXIS

---

[11]     CGH lost its contract with IAA in July 2020. *See* Termination Letter; Owen Tr. 322:17-
323:3.

97011 (D.D.C. May 13, 2019), *34 ("[E]ffort to prepare and submit a proposal for a client's business fall squarely within the plain meaning of solicit.").

The Court also concludes that there is no genuine dispute of material fact that Mr. Owen breached Article 3 of the Non-Compete Agreement. In direct contravention to Article 3's prohibition against "participating in . . . as an . . . agent . . . or consultant" any business which is competitive with CGH, *see* Non-Compete Agreement § 3, Mr. Owen worked as a consultant for CGH competitor Syneca from February 2020 until at least October 2020, *see* Owen/Campbell Email 3. Mr. Owen performed this work remotely from his home in Prince William County, Virginia, where he previously performed work for CGH. *See* Owen Tr. 81:4-8. As a consultant for Syneca, Mr. Owen engaged in several ventures targeting and competing with CGH, including working with Mr. Campbell to draft and submit Syneca's bid for the FOCA contract, assisting Perspecta with its FAA proposal, and assisting Crown in a "strategy" to obtain CGH's contracts. *See* Owen Tr. 174:19-175:11; Campbell Tr. 12:2-19; Strategy to Go After CGH Expiring Contracts; Owen/Campbell Email 3. Moreover, while drafting the FOCA bid for Syneca, Mr. Owen was responsible for communicating with FOCA. *See* Campbell Tr. 136:3-5; *see also, e.g.*, *Mukjeri*, 2019 WL 9143477, at *10 (quoting *Billingham*, 315 F. Supp. 3d at 432) ("[D]irect contacts with a restricted client for the purpose of obtaining business from that client 'plainly violate' a nonsolicitation provision."). On this record, there is no material factual dispute that Mr. Owen breached Article 3 of the Non-Compete Agreement by repeatedly engaging in activities to solicit and divert CGH customers. *See* Non-Compete Agreement art. 3.

**3.      There Is No Genuine Dispute of Material Fact That Mr. Owen Breached Articles 3 and 5 of the Non-Disclosure Agreement**

The Court finds that, on this record, there is no genuine dispute of material fact that Mr. Owen breached Articles 3 and 5 of the Non-Disclosure Agreement by retaining, disseminating,

and utilizing CGH confidential information. The record indicates that both during his employment with CGH and after his termination, Mr. Owen sent several CGH confidential documents to his personal email account from his CGH email account. *See* Owen Tr. 80:10-81:8; CGH Confidential Documents. Mr. Owen accessed one such document, which included information on internal pricing data for the CMC Contracts, on or about October 3, 2020. *See* Owen MacBook Pro File Listing. On October 9, 2020, Mr. Owen's name appeared on a PowerPoint presentation authored by Crown, which outlined its plan to obtain CGH contracts, including the CMC Contracts. *See* Crown PowerPoint. Moreover, in Syneca's bid for the FOCA contract, Mr. Owen lifted language directly from a CGH and IAA proposal submitted to the LFV for ASSET data collection services. *See* Owen Tr. 34:7-37:17. The record, therefore, indicates that there is no material factual dispute that Mr. Owen breached the Non-Disclosure Agreement by failing to "promptly return all tangible expressions of trade secrets and confidential information in his . . . possession" and by "mak[ing] independent use of, publish[ing] [and] disclos[ing]" CGH confidential information. Non-Disclosure Agreement art. 3. The Court further concludes that, as detailed above, there is no dispute of fact that Mr. Owen breached Article 5 of the Non-Disclosure Agreement by using CGH confidential information to "interfere with CGH's relationship[s] with . . . client[s]."[12] *Id.* art. 5.

---

[12]     Though the plaintiff argues that Mr. Owen's access and use of the ASSET application during the drafting of Syneca's FOCA bid also constituted a breach of the Non-Disclosure Agreement, *see* Pl.'s Mot. for Summ. J. at 9, the Court finds that there is a material factual dispute as to whether Mr. Owen's access to the application involved use of confidential information, and therefore declines to enter summary judgment for the plaintiff on its claim for breach of the Non-Disclosure Agreement on this basis, *see* Moore Decl. ¶ 4 (asserting that Mr. Owen's post-employment access to the application was "unauthorized); Owen Tr. 170:18-22 (asserting that the ASSET application is public domain). The Court emphasizes, however, that this conclusion does not change its finding that other actions taken by Mr. Owen constituted breaches of the Non-Disclosure Agreement.

**4.      The Plaintiff Is Entitled to Injunctive Relief**

A permanent injunction may be entered only upon a finding that there is no adequate

remedy at law, the balance of equities favors the party seeking relief, and success on the merits

has been demonstrated. *Ifill v. District of Columbia*, 665 A.2d 185, 188 (D.C. 1995) (citing 43A

C.J.S. Injunctions § 16 (1978)). To preempt the availability of equitable relief, "the legal remedy

must be as complete, practical and efficient as that which equity could afford." *Terrace v.

Thompson*, 263 U.S. 197, 214 (1923).

Here, the plaintiff requests an injunction to prevent Mr. Owen from continuing to breach

the Non-Compete and Non-Disclosure Agreements and to require him to return CGH confidential

information. *See* Pl.'s Mot. for Summ. J. at 11-12. The Court finds, as discussed above, that there

is no genuine dispute of material fact that Mr. Owen breached the Non-Compete and Non-

Disclosure Agreements. The plaintiff has therefore demonstrated success on the merits.

Upon review of the record, the Court finds that there is no adequate remedy at law for the

defendant's breaches of the Non-Compete and Non-Disclosure Agreements. District of Columbia

courts have recognized that the harm caused by disclosure of confidential information is, by nature,

irreparable, as "such information, once disclosed, loses its confidential nature." *Hospitality

Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010). The Court, recognizing

that Mr. Owen's failure to return the plaintiff's confidential information and disclosure of the same

to competitors could result in additional harm to CGH, finds that the plaintiff has demonstrated

harm from Mr. Owen's retention and use of confidential information for which there is no adequate

remedy at law. *See, e.g.*, *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77-78 (D.D.C.

2001) (finding irreparable harm from loss of plaintiff's confidential customer information).

District of Columbia courts have also found that injury to reputation constitutes irreparable harm

warranting entry of a permanent injunction. *See Beacon Assocs. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (finding that the defendant's termination for default "has left a black mark on [the plaintiff's] reputation, irreparable absent an injunction, that will result in many lost contract opportunities").

Here, the record indicates that CGH lost its contract with the IAA after Mr. Owen informed the IAA that the ASSET software could not be implemented without him, *see* Owen Tr. 322:17-323:3, and there is no dispute that Mr. Owen, as a contractor for CGH competitor Syneca, worked to bid against CGH on the FOCA contract and assisted Crown in a "strategy" to obtain CGH contracts, *see id.* 174:19-175:11; Strategy to Go After CGH Expiring Contracts. The Court therefore finds no genuine dispute of material fact that the plaintiff has suffered harm to its professional reputation for which there is no adequate remedy at law. *See, e.g.*, *Patriot, Inc. v. U.S. Dept. of Housing and Urban Dev't*, 963 F. Supp. 1, 5 (D.D.C. 1997) (finding that "plaintiffs have demonstrated irreparable harm in damage to their business reputation").

The Court also finds that the equities favor granting the plaintiff's request for injunctive relief. The plaintiff asserts that it seeks injunctive relief "to prevent [Mr.] Owen from continuing to engaging in wrongful conduct, to protect its customer goodwill and business reputation, and to require [Mr. Owen] to honor his contractual obligations to CGH and abide by applicable law," and specifically asks the Court to enjoin Mr. Owen's use of confidential information to solicit CGH customers. Pl.'s Mot. for Summ. J. at 13. The Agreements imposed on Mr. Owen a one-year restriction on solicitation from CGH customers, *see* Non-Compete Agreement art. 2, an 18-month restriction on participating in business competitive with CGH in the District of Columbia and in Prince William County, *see id.* art. 3, and a two-year restriction on Mr. Owen's use of confidential information, *see* Non-Disclosure Agreement art. 3. Nothing in the record indicates that Mr. Owen's

"right to earn a living" is substantially put at risk, as Mr. Owen would remain free to pursue employment with software development and federal government entities unconnected with CGH. *See Rothe*, 150 F. Supp. 2d at 78. Indeed, Mr. Owen signed and consented to the Non-Compete and Non-Disclosure Agreements, which both contain provisions entitling CGH to injunctive relief in the event of breach. *See Reyes*, 736 F. Supp. 2d at 201 (finding that the equities favored injunctive relief where the defendant "consented to injunctive relief to enforce the provisions of the Restrictive Covenant"). The Court therefore finds that the equities favor granting the plaintiff's request for injunctive relief.

Finally, the Court finds that granting the plaintiff's request for injunctive relief serves the public interest. *Cf., e.g.*, *Reyes*, 736 F. Supp. 2d at 201 ("The Court finds that the public interest would be furthered by the issuance of a preliminary injunction [to] enforce the parties' contractual agreement and ensure the confidentiality of business information, which is necessary for free and fair competition."); *Rothe*, 150 F. Supp. 2d at 79 (finding that by issuing an injunction, "the court serves the public interest in protecting trade-secret client lists and other confidential information" and noting that "[a] final factor tipping the public-interest scales to the plaintiff's side is the court's desire to see a reasonable contract enforced"). The Court therefore concludes that the plaintiff is entitled to an injunction enforcing the terms of the Non-Compete and Non-Disclosure Agreements.

The Court also finds that extension of the restrictive covenants in the Non-Compete and Non-Disclosure Agreements is warranted by the express terms of the Agreements. Article 2 of the Non-Compete Agreement runs for one year after Mr. Owen's termination, but shall be tolled under Article 7 for the duration of the breach. *See* Non-Compete Agreement art. 2, 7. Meanwhile, Article 3 of the Non-Compete Agreement runs for 18 months after either Mr. Owen's termination or the date a court of competent jurisdiction enters an order enforcing the provision, *see id.* art. 3, while

27

Article 3 of the Non-Disclosure Agreement runs for two years, *see* Non-Disclosure Agreement art. 3. Although this Court has not identified any cases in this jurisdiction addressing the issue, several courts in neighboring jurisdictions have extended restrictive covenants beyond their stated terms in cases where defendants remain in breach during the terms of the covenants. *See, e.g.*, *Hair Club for Men, LLC v. Ehson*, 2016 U.S. Dist. LEXIS 158258, at \*15 (E.D. Va. Nov. 14, 2016); *TEKsystems, Inc. v. Bolton*, 2010 U.S. Dist. LEXIS 9651, at \*30 (D. Md. Feb. 4, 2010); *but see, e.g.*, *Larweth v. Magellan Health, Inc.*, 2021 U.S. Dist. LEXIS 37012, at \*6 (M.D. Fla. Jan. 11, 2021); *Aladdin Capital Holdings, LLC v. Donoyan*, 2011 U.S. Dist. LEXIS 61095, at \*14 (D. Conn. June 8, 2011).

The Court, keeping in mind its "wide latitude in fashioning [an equitable] remedy," *Sec. and Exch. Comm'n v. First City Fin. Corp.*, 890 F. 2d 1215, 1228 (D.C. Cir. 1989), and noting that the record indicates that Mr. Owen was in breach of Article 2 of the Non-Compete Agreement until at least October 2020, *see* Strategy to Go After CGH Expiring Contracts, finds that the plaintiff is entitled to an equitable extension of the Non-Compete and Non-Disclosure Agreements for a period of time equal to the duration of Mr. Owen's breach.

5.    **The Plaintiff is Entitled to Nominal Damages and Attorney's Fees**

Under Article 6 of the Non-Compete Agreement, CGH is entitled to "remedies . . . at law or in equity" as well as to injunctive relief. *See* Non-Compete Agreement art. 6. Here, although the plaintiff maintains that it suffered actual damages as a result of the defendant's breaches, *see* Pl.'s Mot. for Summ. J. at 11, it has not offered evidence of such damages in connection with this motion for summary judgment.[13] Yet, the plaintiff maintains that the absence of such evidence

---

[13]    The plaintiff advises that it intends to present evidence of and seek recovery for such actual damages at trial.

does not preclude the entry of summary judgment on its breach of contract claims. The Court concurs.

The District of Columbia Court of Appeals has observed that "[e]ven where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages." *Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013) (citing *Bedell v. Inver Housing, Inc.*, 506 A.2d 202, 205 (D.C. 1986)); *accord Legal Tech. Grp., Inc. v. Rajiv Mukerji*, 2019 U.S. Dist. LEXIS 97011, at *43-44 (D.D.C. June 10, 2019) (concluding that because the claimant had established that the defendant breached his restrictive covenant, the damages element of the breach of contract claim was necessarily satisfied).

As discussed above, the plaintiff has established as a matter of law the defendant's breaches of the Non-Compete Agreement and the Non-Disclosure Agreement. The plaintiff is entitled to nominal damages with respect to those claims. Moreover, as both the Non-Compete and Non-Disclosure Agreements provide that CGH may recover its attorney's fees and costs in the event of Mr. Owen's breach, *see* Non-Compete Agreement art. 6, Non-Disclosure Agreement art. 6, the Court finds that the plaintiff is entitled to its reasonable attorney's fees and costs.

**B.     The Court Enters Summary Judgment for the Plaintiff on its Breach of Fiduciary Duty Claim (Count III of the Complaint)**

To prevail on a claim for breach of fiduciary duty, a plaintiff "must prove facts sufficient to establish the following: (1) the defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) the breach proximately caused an injury." *Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254 (D.D.C. 2010). "[B]reach of fiduciary duty is not actionable unless injury accrues to the beneficiary or the fiduciary profits thereby." *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 709 (D.C. 2009) (quoting *Beckman v. Farmer*, 579 A.2d 618, 651 (D.C. 1990)).

Employees, particularly managers and officers, "owe an undivided and unselfish loyalty to the corporation" during the term of their employment, "such that there shall be no conflict between duty and self-interest." *Wilde*, 920 F. Supp. at 233; *see also Marmac Inv. Co. v. Wolpe*, 759 A.2d 620, 626 (D.C. 2000) ("The fiduciary nature of the partnership relation requires at all times the highest degree of good faith, and precludes any secret profit, benefit or advantage of any kind.") (citing 1 Scott Rowley, *Rowley on Partnership* 515 (1960)). Though an agent of a company may "make arrangements or plans to go into competition with his principal before terminating his agency," he may only do so "provided no unfair acts are committed or injury done [to] his principal." *Id.*; *see also Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 53 (D.D.C. 2001) (wrongful acts constituting breach of fiduciary duty include "misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation by the firm's employees"). An employee's fiduciary duty generally ends upon the termination of the employment relationship. *See Phillips v. Mabus*, 894 F. Supp. 2d 71, 93 (D.D.C. 2012); *see also United States Travel Agency v. WorldWide Travel Serv. Corp.*, 235 A.2d 788, 789 (D.C. 1967) ("An agent after termination of his employment, in the absence of an agreement to the contrary, may compete with his former principal.").

Here, the plaintiff argues that Mr. Owen breached his fiduciary duty to CGH by retaining and disclosing CGH confidential information, soliciting CGH customers while still employed, and failing to ensure that CGH abided by the FLSA. *See* Pl.'s Mot. for Summ. J. at 16-17. Though the Court agrees with the plaintiff that Mr. Owen, as the COO and head of CGH's financing department, *see* Owen Tr. 81:4-8, 92:2-9, owed CGH a fiduciary duty, it cannot find, on this record, that there is no material factual dispute that Mr. Owen breached his fiduciary duty for the reasons identified by the plaintiff. Though, as discussed above, the Court finds that the plaintiff is

30

entitled to judgment on its claim for Mr. Owen's breach of the Non-Disclosure agreement, the plaintiff does not identify, nor does the record contain, evidence of any specific injury suffered by the plaintiff as a result of Mr. Owen's disclosure of confidential information. Similarly, though the record indicates that Mr. Owen solicited work from the IAA while employed at CGH, *see* Owen Tr. 321:20-324:19, and that CGH lost its contract with the IAA in July 2020, *see id.* 322:17-323:3, there remains a genuine dispute of fact as to whether CGH lost this contract because of Mr. Owen's actions. In the absence of record evidence on any injury to CGH as a result of Mr. Owen's disclosure of confidential information or solicitation of CGH customers, the Court cannot find that these actions constitute a breach of Mr. Owen's fiduciary duty. *See Alemayehu v. Abere*, 315 F. Supp. 2d 212, 217 (D.D.C. 2018) (finding that employee's breach of fiduciary duty was not actionable where employer failed to show that he suffered injury). And as for the plaintiff's contention that Mr. Owen breached his fiduciary duty by failing to ensure that CGH complied with FLSA, leading to the *Pennington* litigation, neither party has produced evidence on whether Mr. Owen's alleged directive to the technicians at issue constituted a breach of FLSA.

The Court, however, finds that there is no genuine dispute of material fact that Mr. Owen breached a fiduciary duty to CGH by working with Mr. Campbell to bid on an FAA contract on behalf of Perspecta, a CGH competitor, and by entering into a consulting agreement with Concepts Beyond, another CGH competitor. *See* Campbell Tr. 12:2-19; Owen Interrogs. ¶ 10. Though an employee's duty not to compete with his former employer generally ends upon his termination, *see Phillips*, 894 F. Supp. 2d at 93, Article 3 of the Non-Compete Agreement imposed a fiduciary duty on Mr. Owen to refrain from connecting with CGH's business competitors as an agent or consultant for a period of eighteen months after his termination, *see* Non-Compete Agreement art. 3. As discussed above, Mr. Owen's work with Perspecta and Concepts Beyond constituted

31

breaches of the Non-Compete Agreement, and there is no dispute that he was paid $15,000 and

$5,460 respectively for this work. *See* Campbell Tr. 12:2-12; Owen Interrogs. ¶ 10. The Court

therefore concludes that because this work profited Mr. Owen, *see Randolph*, 973 A.2d 702, there

is no material factual dispute that Mr. Owen breached his fiduciary duty to CGH by engaging in

work for Perspecta and Concepts Beyond, and grants the plaintiff's motion for summary judgment

on its breach of fiduciary claim on this basis. *See, e.g., Avianca, Inc. v. Corriea*, 1993 U.S. Dist.

LEXIS 20953, at *4 n.1 (D.D.C. Aug. 27, 1993) ("When the claim – as here – is based on a breach

of fiduciary duty, however, plaintiffs merely must show that [the fiduciary] impermissibly profited

from the compensation."). The Court therefore grants summary judgment to the plaintiff on Count

III of the complaint.

**C.     The Court Enters Summary Judgment for the Plaintiff on the Defendant's Claim for
         Retaliation Under the FCA (Count I of the Counterclaim)**

The FCA creates a cause of action for relief from retaliatory actions. 31 U.S.C. § 3730(h)(1)

provides that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to
> make that employee, contractor, or agent whole, if that employee, contractor,
> or agent is discharged, demoted, suspended, threatened, harassed, or in any
> other manner discriminated against in the terms and conditions of employment
> because of lawful acts done by the employee, contractor, agent or associated
> others in furtherance of an action under this section or other efforts to stop 1 or
> more violations of this subchapter.

*Id.* This section was "designed to protect persons who assist the discovery and prosecution of fraud

and thus to improve the federal government's prospects of deterring and redressing crime."

*Saunders v. District of Columbia*, 958 F. Supp. 2d 222, 228 (D.D.C. 2013) (quoting *Neal v.

Honeywell Inc.*, 33 F.3d 860, 861 (7th Cir. 1994)). To prevail on an FCA claim under this section,

a plaintiff must make out a *prima facie* case of retaliation by showing "(1) acts by the employee

'in furtherance of' a suit under § 3760—acts also known as 'protected activity'; and (2) retaliation

by the employer against the employee 'because of' those acts." *United States ex. Rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012). Under the first element, the plaintiff "must be able to show that the action he was trying to stop was a violation of the FCA," or, in other words, the plaintiff's investigation must concern "false or fraudulent claims." *Hicks v. District of Columbia*, 306 F. Supp. 3d 131, 157 (D.D.C. 2018).

In his counterclaim, the defendant alleges that he engaged in protected activity by protesting Ms. Troutman's alleged practice of including farm expenses in the calculation of overhead costs and indirect rates submitted to the federal government, and that therefore, his termination from CGH violated the anti-retaliatory provision of the FCA. *See* Countercl. ¶¶ 35-47. On this record, however, the Court finds that there is no genuine dispute of material fact that the defendant cannot establish that he engaged in "protected activity" under the FCA, and therefore cannot make out a *prima facie* case under the statute. *See Schweizer*, 677 F.3d at 1237. According to CGH, loans to cover Ms. Troutman's farm expenses are reported on CGH's income statement as an account receivable, and these loans are not considered as an asset for determining CGH's borrowing base. *See* Notes to 2018 CGH Financial Statements; Perando Decl. ¶¶ 5. Though the defendant asserts that Ms. Troutman never intended to repay these loans, *see* Owen Tr. 183:5-187:20, he fails to cite to any record evidence to support this assertion; instead, the record indicates that to date, Ms. Troutman has repaid at least $500,000 to CGH, *see* Wire Transfer. The defendant, therefore, has failed to demonstrate, as he must to establish a *prima facie* case, that CGH made "false or fraudulent claims" giving rise to a claim under the FCA. *See Hicks*, 306 F. Supp. 3d at 157. Moreover, the defendant has failed to produce any evidence showing that he ever protested the alleged inclusion of Ms. Troutman's farm expenses in the indirect rates; instead, in December 2019, Mr. Owen sent an email to Ms. Troutman suggesting that she "forgive" a portion of the farm

receivable on CGH's income statement. *See* Owen/Troutman Email. As there is no material factual

dispute, on this record, that the defendant cannot demonstrate that he engaged in "protected

activity," and therefore cannot carry his burden to make out a *prima facie* case of retaliation, *see*

*Schweizer*, 677 F.3d at 1237, the Court finds that the plaintiff is entitled to summary judgment on

the defendant's counterclaim for retaliation under the FCA.

## III.   THE COURT GRANTS THE PLAINTIFF'S MOTION TO SEAL AS CONCEDED

In its motion to seal, the plaintiff asks the Court to seal Exhibit 33 in support of its to its

motion for partial summary judgment, which "contains CGH confidential information," including

an internal pricing model for the CMC Contract. *See* Pl.'s Mot. to Seal at 3. Though the plaintiff's

motion indicates that the defendant did not consent to the requested relief, the defendant did not

file an opposition. *See generally id.*

The Court grants the plaintiff's motion to seal as conceded. Pursuant to D.C. Super. Ct.

Civ. R. 12-I, within fourteen days of service of a motion, "an opposing party must file and serve a

statement of opposing points and authorities in opposition to the motion." D.C. Super. Ct. Civ. R.

12-I(e). "If a statement of opposing points and authorities is not filed within the prescribed time,

the court may treat the motion as conceded." *Id.* "The conceded motion provision is a judicial

housekeeping device intended to serve the cause of judicial efficiency and case management and

to benefit the administration of justice." *District of Columbia v. Davis*, 811 A.2d 800, 803 (D.C.

2002) (quotation marks and citation omitted). A court need not provide need notice before

enforcing the conceded motion provision. *See Jackson v. ASA Holdings, LLC*, 751 F. Supp. 2d 91,

91 (D.D.C. 2010) (citing *Fox v. Am. Airlines*, 389 F.3d 1291, 1294-95 (D.C. Cir. 2004)).

34

Here, the defendant failed to file an opposition to the plaintiff's motion to seal within fourteen days of service in accordance with the Court's rules. The Court therefore grants the plaintiff's motion as conceded.

## IV.    THE COURT DENIES THE PLAINTIFF'S MOTIONS FOR SANCTIONS AND TO STRIKE AS MOOT

In the plaintiff's motion for sanctions, filed on May 24, 2021, it argues that the Court should enter default judgment against the defendant pursuant to D.C. Super. Ct. Civ. R. 37(e) on counts I, II, and II of the complaint and should dismiss count I of the defendant's counterclaims due to the defendant's "admitted, egregious and willful spoliation of evidence, and the resulting significant prejudice to [the plaintiff]."[14] *See* Pl.'s Mot. for Sanctions at 1. On June 9, 2021, the plaintiff filed a motion to strike the defendant's untimely opposition to the motion for sanctions, representing that the opposition was filed on June 9, 2021, 16 days after service of the motion for sanctions.[15] The defendant's opposition to the plaintiff's motion for sanctions appeared on the docket on June 11, 2021. *See generally* Def.'s Opp'n to Pl.'s Mot. for Sanctions. As the Court has concluded that the plaintiff is entitled to summary judgment on counts I, II, and III of the complaint and count I of the defendant's counterclaim, the plaintiff's motions for sanctions and to strike are denied as moot.

---

[14]    Under D.C. Super. Ct. Civ. R. 37(e), if a party fails to take reasonable steps to preserve electronically stored information that should have been preserved in anticipation of litigation, a court may, upon finding that the party acted with the intent to deprive the opposing party of the information, may "presume that the lost information was unfavorable to the party," "instruct the jury that it may or must presume the information was unfavorable to the party," or "dismiss the action or enter a default judgment."

[15]    D.C. Super. Ct. Civ. R. 12-I(e) provides that within fourteen days of service of a motion, "an opposing party must file and serve a statement of opposing points and authorities in opposition to the motion."

## CONCLUSION

Accordingly, it is this 5th day of November, 2021, hereby

**ORDERED** that the defendant's motion for summary judgment is **DENIED**; and it is further

**ORDERED** that the plaintiff's motion for partial summary judgment is **GRANTED**; and it is further

**ORDERED** that summary judgment is entered for the plaintiff on counts I, II, and II of the complaint and count I of the counterclaim; and it is further

**ORDERED** that the defendant is enjoined from violating Article 2 of the Non-Compete Agreement for a period of one (1) year after the date of this order; and it is further

**ORDERED** that the defendant is enjoined from violating Article 3 of the Non-Compete Agreement for a period of 18 months after the date of this Order; and it is further

**ORDERED** that the defendant is enjoined from violating Article 3 of the Non-Disclosure Agreement for a period of two (2) years after the date of this order; and it is further

**ORDERED** that the defendant is directed to return to CGH any and all of its confidential and proprietary documents, whether in original, copied, electronic, or any other reproduced form; and it is further

**ORDERED** that the plaintiff shall submit a petition for reasonable attorney's fees and costs on or before November 19, 2021, and with the defendant to submit his response on or before December 3, 2021; and it is further

**ORDERED** that the plaintiff's motion for a court order sealing exhibit in support of its motion for partial summary judgment is **GRANTED AS CONCEDED**; and it is further

**ORDERED** that the plaintiff's motion to sanction defendant for spoliation of evidence is

**DENIED AS MOOT**; and it is further

**ORDERED** that the plaintiff's motion to strike defendant's untimely opposition to

plaintiff's motion to sanction defendant for spoliation of evidence is **DENIED AS MOOT**; and

it is further

**ORDERED** that the parties shall appear for mediation on December 15, 2021 at 11:00

a.m.[16]

    **SO ORDERED.**

           Judge Jason Park
           Superior Court of the District of Columbia

Copies to:

Glynn Owen
Christiane McKnight, Esq.
Christopher Schwartz, Esq.
*Via CaseFileXpress*

---

[16]     Issues left unresolved by this order include Count II of the defendant's counterclaims, as
well as the plaintiff's claims for actual damages and attorney's fees and costs.